GARZA, Circuit Judge, specially
concurring:
I concur in the judgment and in the majority’s conclusion that the district court abused its discretion in excluding Dr. Ro-senthal’s testimony. I also agree with the majority’s reasoning with the exception of its discussion of Dr. Rosenthal’s “methodology,” primarily in Part III.A. In my view, Dr. Rosenthal’s testimony on the standard of care and its alleged breach in this case is admissible because her qualifications and experience are sufficient. Under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), this case does not implicate any “methodology.” Rather, the reliability of Dr. Rosenthal’s testimony on the standard of care and its alleged breach depends only upon her knowledge of the abnormalities that a Laboratory Corporation of America (“LabCorp”) cytoteehnologist should be capable of detecting in Pap smear slides.
A.
Implicit in the majority’s analysis is that the admissibility of Dr. Rosenthal’s opinion hinges on the reliability of her “methodology.” Ante at 1328. Although that methodology is never precisely defined, the majority mentions Dr. Rosenthal’s “personally reviewing] the available physical evidence, which consisted of Ms. Adams’s Pap smear slides,” “using the same standard microscope as LabCorp’s cytotechnologists,” “scanning each slide in the same general manner as its cytotechnologists do,” and “photograph[ing] Ms. Adams’s slides and us[ing] those photographs in her deposition testimony.” Id. at 1329. In the majority’s view, moreover, the fact that Dr. Rosenthal “applied an established diagnostic system in which she was well versed,” id. at 1329, and “appli[ed] ... her extensive, relevant experience contributed to the reliability of her methodology,” id. at 1330.
In my view, the majority’s attention to “methodology” misses the mark. The majority fails to focus on the record evidence that illuminates the exact dispute before us — namely, the specifics of a cytotechnol-ogist’s task and the manner in which Dr. Rosenthal formed her opinion about Ms. Adams’s slides.
Cytotechnologists are responsible for screening Pap smear slides for signs of *1337 disease and malignancy. A single slide can contain thousands of cells, and cyto-technologists must flag for further review by a pathologist any cells that might be cancerous or precancerous. This determination is guided by the Bethesda System, an atlas of images containing various “classic examples” of cytomorphologic features.[1] In Dr. Rosenthal’s words, properly trained cytotechnologists will “know what benign looks like” when they “decide whether or not they’re going to send [the slide] on to the pathologist.” Without constant practice in this “qualitative, subjective skill,” even Dr. Rosenthal requires “a few days ... to ‘get [her] eye back.’ ” A eytotechnologist’s task, then, involves not a “methodology,” but judgment — refined and disciplined through training, practice, and knowledge of cytomorphologic features so that one is capable of detecting abnormalities.
This professional judgment underlies Dr. Rosenthal’s testimony about a cyto-technologists standard of care and the LabCorp cytotechnologists’ alleged breach of that standard. In her deposition, Dr. Rosenthal explained the “standard of care” as “what a recent graduate of a cytotech-nology training program would be able to detect under normal screening conditions on a particular slide as an abnormality” — a domain of knowledge with which she is intimately familiar, having trained cyto-technologists for forty years. As for the alleged breach of the standard of care, Dr. Rosenthal’s expert report concluded that on numerous occasions, LabCorp cytotech-nologists “misinterpreted” Ms. Adams’s Pap smear slides and that these errors accordingly “fell below the standard of care for a cytotechnologist.”[2] These opinions on the alleged breach followed from her visual observation of Ms. Adams’s slides and were “based on over 40 years of professional experience at two major medical centers in which [her] career was devoted to cytologic interpretation.”[3] In addition to her experience, Dr. Rosenthal relied on the Bethesda System classifications, which, again, are the same as those used by the cytotechnologists in this case.
Both the eytotechnologist’s task and Dr. Rosenthal’s review involve only the application of professional judgment, not “methodology.”[4] The majority, however, *1338 erroneously conflates scientific knowledge with scientific “methodology.” To be sure, both LabCorp cytotechnologists and Dr. Rosenthal applied knowledge derived through a scientific methodology — ie., knowledge of the various cell classifications catalogued in the Bethesda System, whose validity is not in dispute.[5] But in the application of this knowledge, there is no methodology; the observer merely views a slide and forms her judgment based on her knowledge.
B.
Because the admissibility of Dr. Rosen-thal’s testimony hinges on the reliability of her knowledge of a cytoteehnologist’s standard of care rather than the reliability of any “methodology,” her competence renders her testimony admissible under McDowell v. Brown, 392 F.3d 1283 (11th Cir.2004).
In McDowell, this Circuit held that the competency of a standard-of-care expert satisfies the demands of Rule 702 and Daubert. In that case, McDowell brought a medical negligence suit under Georgia law against Wexford Health Sources, which provided medical services in the jail in which he was detained. Id. at 1286-87. McDowell alleged that despite his symptoms of severe pain, Wexford’s nurse negligently failed to arrange for his timely transport to a nearby hospital for treatment, and that this delay proximately caused his partial paraplegia. Id. To support his claim, McDowell sought to have three doctors testify that Wexford’s nurse breached the standard of care applicable to nurses. The district court, however, excluded his experts’ testimony on the basis that they were “unqualified to render an opinion as to the standard of care applicable to nurses.” Id. at 1296.
On appeal, this Court reversed the district court’s ruling, basing its determination on the experts’- competency, without mention of any “methodology.” The panel began by explaining that the admissibility of standard-of-care expert testimony hinges on both state substantive law and federal procedural law: “[I]f a witness is deemed competent to testify to the substantive issue in the case [under state law], such as the standard of care, his or her testimony should then be screened by Rule 702 to determine if it is otherwise admissible expert testimony.” Id. at 1295 (quoting Legg v. Chopra, 286 F.3d 286, 292 (6th Cir.2002) (emphasis added)). Next, the panel explained that under Georgia law, a standard-of-care expert in a medical malpractice case must possess “knowledge of *1339 the standard of care applicable to the defendant-professional as to at least one of the matters on which the plaintiffs malpractice claim is based.” Id. at 1296 (citation omitted). The panel reasoned that because “[a] physician’s area of expertise necessarily encompasses the standard of care applicable to nurses,” id., “the experts [were] competent to render opinions as to the applicable standard of care for Wex-ford’s nurses,” id. at 1297.
The panel ultimately concluded that “the district court erred in excluding the experts’ testimony as to the applicable standard of care.” Id. at 1301. To be sure, the panel did not expressly assess the standard-of-care testimony under either Rule 702 or Daubert.[6] However, the panel’s earlier conclusion that these federal evidentiary rules govern the standard-of-care expert testimony in addition to state substantive law, id. at 1295, can only mean that the doctors’ competency under Georgia law was also sufficient to satisfy both Rule 702 and Daubert.[7]
McDowell governs this case. Here, like the doctors in McDowell, Dr. Rosenthal was amply competent to testify about the alleged breach of the standard of care in light of her “knowledge of the standard of care applicable to the defendant-professional.” Id. at 1296. Indeed, the parties do not dispute her competency, ante at 1828 n. 9, and the majority acknowledges Dr. Rosenthal’s “extensive” qualifications, id. at 1325. Moreover, neither McDowell nor this case implicates a “methodology”; rather, both cases involve the expert’s application of professional knowledge to certain facts. Here, those facts were contained on Ms. Adams’s Pap smear slides; in McDowell, they took the form of McDowell’s acute symptoms. McDowell, 392 F.3d at 1286-87. So long as Dr. Rosenthal has applied medical or scientific knowledge in evaluating the actions or omissions of a eytotechnologist, her opinion is reliable.[8]
Accordingly, under McDowell, Dr. Ro-senthal’s opinion about the alleged breach of the cytotechnologist’s standard of care is reliable and admissible.
C.
McDowell’s recognition that standard-of-care expert testimony generally originates in professional judgment accords with this Circuit’s case law on Daubert and with the decisions of several other circuits.
Experts testifying on the breach of a standard of care opine on the content of that standard and whether a party’s behavior deviated from it. When such opinions are empirical, professional judgments, they are based on “reliable principles and methods” so long as they are derived from *1340 the expert’s competency and qualifications. Fed.R.Evid. 702(c); see also Palandjian v. Foster, 446 Mass. 100, 842 N.E.2d 916, 923 & n. 12 (2006). Such testimony generally does not require devising new analyses to explain factual phenomena — an inquiry for which Rule 702 and Daubert’s concern with “methodology” is quintessential^ important.[9] Nor must such experts precisely replicate a litigant’s circumstances before they may opine on an alleged breach of the standard of care under those circumstances; hence, the majority correctly rejects LabCorp’s contention that Dr. Rosen-thal must “stand in the shoes” of actual cytotechnologists. Ante at 1335-36. To be sure, the professional knowledge underlying testimony about the breach of a standard of care may have scientific bases — as in Dr. Rosenthal’s case here, and in the case of the doctors in McDowell.[10] But as explained above, the application of scientific knowledge does not necessarily implicate a “methodology.”
McDowell’s attention to competency rather than methodology accords with this Circuit’s flexible, context-sensitive application of Daubert. We recognize that “there are instances in which a district court may determine the reliability prong under Dau-bert based primarily upon an expert’s experience and general knowledge in the field.” Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1336 (11th Cir.2010) (citing United States v. Brown, 415 F.3d 1257 (11th Cir.2005)) (emphasis added). We have further noted that “Daubert’s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.” Brown, 415 F.3d at 1267 (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). These principles find further support in the Advisory Committee Note’s explanation that “the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.” Fed. R.Evid. 702 advisory committee’s note (2000 Amendments) (emphasis added). The Note continues: “If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.” Id.; see also Kumho Tire, 526 U.S. at 156, 119 S.Ct. 1167 (“[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.”). As in McDowell, and as permitted by Kilpatrick, Dr. Ro-senthal’s “experience and general knowledge” are sufficient to satisfy Rule 702 and Daubert. Kilpatrick, 613 F.3d at 1336.
Similarly, several other courts of appeals applying Rule 702 and Daubert to standard-of-care expert testimony have determined that the testimony in question is admissible so long as the expert is competent or qualified. See, e.g., Dickenson v. Cardiac & Thoracic Surgery of E. Tenn., P.C., 388 F.3d 976, 980-82 (6th Cir.2004) (cardiac thoracic surgeon could testify about standard of care of pulmonologist on basis of “extensive relevant experience,” id. at 982, and was not required to demonstrate familiarity with pulmonology literature or standards); Sosna v. Binnington, 321 F.3d 742, 745-46 (8th Cir.2003) (con- *1341 eluding that internist was “competent,” id. at 746, to testify about standard of care of surgeon, based on expertise and experience treating patients who underwent surgeries); Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 405-409 (3d Cir.2003) (concluding that two experts were competent to testify about standard of care based, respectively, on “experience,” id. at 406, and “qualifications,” id. at 409).
McDowell sets forth a sound general rule for screening expert testimony on the breach of a standard of care, and I would apply it here.
D.
By failing to delineate the boundaries of Dr. Rosenthal’s “methodology,” today’s opinion neglects to explain when courts must depart from McDowell and undertake this additional assessment of “methodology.”
The majority struggles to define Dr. Ro-senthal’s “methodology.” In an apparent attempt, the majority observes that Dr. Rosenthal “personally reviewed the available physical evidence,” “us[ed] the same standard microscope as LabCorp’s cyto-technologists,” “scan[ned] each slide in the same general manner as its cytotechnolo-gists do,” and later “photographed Ms. Adams’s slides.” Ante at 1329. However, this ad hoc list of activities offers no principled explanation of where Dr. Rosen-thal’s “methodology” begins and ends. Adding to the confusion, the majority claims that Dr. Rosenthal need not “stand in the shoes of the defendant” by “recreating] the conditions and circumstances cytotechnologists face” — that is, reviewing “a large number of slides without already knowing whether they contained cells that were abnormal.” Id. at 1335. While I agree that replicating the exact circumstances of a cytotechnologist is wholly unnecessary, supra Part C, I can discern no analytical principles in the majority opinion for determining when an expert uses a methodology.
Because of the majority’s inability to define Dr. Rosenthal’s purported methodology, future courts have no guidance as to when scrutiny of methodology — an exception to McDowell — is required in the first place. In certain cases, I would agree that courts must validate the reliability of an expert’s methodology.[11] For instance, to prove a breach of the standard of care, an expert might be called upon to establish the speed of a car at the moment of impact, or the temperature of a coffee when spilled.[12] But at least here, where the expert simply applies her professional *1342 judgment to the same facts that confronted the litigant, McDowell applies.[13]
As the majority correctly explains, Rule 702 and Daubert govern all expert testimony based on “scientific, technical, or other specialized knowledge.” Ante at 1326 (quoting Kumho Tire, 526 U.S. at 149, 119 S.Ct. 1167). I thus agree that the gatek-eeping inquiry under Rule 702 and Dau-bert applies to Dr. Rosenthal’s testimony, which is certainly based on “scientific” knowledge.
At bottom, the majority and I disagree over the meaning of “methodology” and its role in the gatekeeping inquiry in this particular case.[14] In my view, neither the LabCorp cytotechnologists nor Dr. Rosen-thal applied a methodology in assessing Ms. Adams’s Pap smear slides; rather, they simply drew upon their knowledge in viewing those slides. Therefore, under McDowell, the reliability of Dr. Rosen-thal’s testimony on a eytotechnologist’s standard of care and its alleged breach depends only on the reliability of her knowledge — ie., her competency. Accordingly, because no party disputes that Dr. Rosenthal is competent to testify on the standard of care and its alleged breach, I would hold that the district court abused its discretion in excluding her testimony.

. As the Adamses note, the Bethesda System’s atlas containing its images and classifications can be found online at http://nih.techriver.net/ index.php.

. For instance, Dr. Rosenthal’s report claimed: "The March 20, 2008 Pap test was misinterpreted by cytotechnologists Robert Allison and Greg McDaniel, as showing ‘NILM [negative for intraepithelial lesion and malignancy] with squamous component cells present'. This error in interpretation fell below the standard of care for a cytotechnologist.” Dr. Rosenthal's affidavit elaborates on her opinion as to the correct assessment of the March 20, 2008 test: "The test actually revealed HSIL [high-grade squamous intraep-ithelial lesion] with endocervical component cells present,” where HSIL is a “high grade cervical cancer precursor condition.”

. As the majority explains, Dr. Rosenthal has been a pathology professor since 1995, served on the task force that developed the Bethesda System used by cytotechnologists for reporting Pap smear results, and has over forty years of experience in training cytotechnolo-gists. Ante at 1325-26.

. The majority asserts that ”[w]hether [Dr. Rosenthal’s] approach is called a ‘methodology’ or simply 'application of professional judgment’ does not matter.” Ante at 1330 n. 13. But words do matter to trial courts tasked with ensuring the reliability of expert testimony under Rule 702 and Daubert. Here, Dr. Rosenthal’s application of her knowledge of the standard of care and identification of an alleged breach do not implicate a methodology warranting independent scrutiny. By contrast, in Daubert and Kumho Tire, the Su *1338 preme Court assessed the methodologies of experts who sought to testify, respectively, that a particular drug caused birth defects and that a tire’s manufacturing or design defect caused its failure. See Daubert, 509 U.S. at 593, 113 S.Ct. 2786 ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry.”); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 153-54, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("[T]he specific issue before the court was not the reasonableness in general of a tire expert’s use of a visual and tactile inspection to determine whether over-deflection had caused the tire's tread to separate from its steel-belted carcass. Rather, it was the reasonableness of using such an approach, along with [the expert’s] particular method of analyzing the data thereby obtained, to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant.”).

. The majority, notably, does not claim that the Bethesda System itself is a "methodology,” but only that Dr. Rosenthal's use of that "well-established classification system” “contributed to the reliability of her methodology.” Ante at 1329.

. By contrast, the McDowell panel explicitly applied Rule 702 and Daubert in concluding that the district court did not abuse its discretion in excluding expert testimony about causation, since the experts offered little support for their belief that McDowell's treatment delay caused his injury. McDowell, 392 F.3d at 1297-1301.

. For this reason, the majority incorrectly distinguishes McDowell on the grounds that "there is no substantive state law issue presented on appeal.” Ante at 1328 n. 8. McDowell is the leading authority in this Circuit on the admissibility of medical malpractice standard-of-care expert testimony under federal procedural law, and stands for the proposition that such testimony is admissible under Rule 702 and Daubert so long as the expert is competent under state law.

.Of course, once admitted, Dr. Rosenthal’s testimony would be subjected to the rigors of cross-examination. See ante 1334-35.

. See supra note 4.

. In addition to scientific disciplines, an expert’s knowledge subject to Rule 702 and Daubert can originate from other “technical” or “specialized” fields of inquiry. See Kumho Tire, 526 U.S. at 149, 119 S.Ct 1167. Here, however, Dr. Rosenthal's knowledge certainly has a scientific basis.

. Experts attempting to demonstrate causation often deploy methodologies to test whether a certain causal hypothesis has factual support. See, e.g., Kilpatrick, 613 F.3d at 1336— 43 (reviewing differential diagnosis methodology employed by expert testifying on causation and concluding that district court did not abuse discretion in excluding testimony for lack of reliable methodology); see also Guinn v. AstraZeneca Pharms. LP, 602 F.3d 1245, 1252-56 (11th Cir.2010) (same); see also supra note 4 (discussing "methodology” at issue inDaubert andKumho Tire).

. See also Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir.2011) (explaining that "[a] qualified expert who uses reliable testing methodology may testify as to the safety of a defendant’s choice of flooring, determined by the surface’s coefficient of friction”); Lees v. Carthage College, 714 F.3d 516, 524 (7th Cir.2013) (noting that even if parties did not dispute expert’s qualifications, assessment of reliability of expert's testimony about college’s alleged breach of standard of care required further analysis of soundness of his "methodology”).

. Moreover, as in McDowell, the conduct of the defendant is undisputed and requires no factual analysis by the expert: Here, the Lab-Corp cytotechnologists did not flag abnormalities for further review by a pathologist. For the purposes of this appeal, the only issue is whether this conduct breached the applicable standard of care.

. The Supreme Court has not had occasion to clarify the meaning of "methodology,” though the term has given rise to some disagreement among the Justices. In General Electric Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Court noted that "conclusions and methodology are not entirely distinct from one another,” and that although "[t]rained experts commonly extrapolate from existing data,” "nothing ... requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.” Id. at 146, 118 S.Ct. 512. Justice Stevens, in dissent, explained that the Court incorrectly blurred the line between methodology and conclusions, which he analogized to the conceptual difference between “means and ends.” Id. at 155, 118 S.Ct. 512 (Stevens, J., dissenting). Justice Stevens claimed that the expert had reviewed the studies under a “ ‘weight of the evidence' methodology,” which was reliable enough to deem his testimony admissible and allow a jury to assess the soundness of his conclusions. Id. at 152-54, 118 S.Ct. 512 (Stevens, J., dissenting).