*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 04a0361p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NANCY DICKENSON, Conservator for Sandra Robinson,
*Plaintiff-Appellant,*

*v.*

No. 03-5355

CARDIAC AND THORACIC SURGERY OF EASTERN
TENNESSEE, P.C. and ROBERT ROSSER, M.D.,
*Defendants-Appellees.*

>

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 00-00405—Dennis H. Inman, Magistrate Judge.

Argued: September 22, 2004

Decided and Filed: October 25, 2004

Before: KEITH, MOORE, and GILMAN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Timothy W. McAfee, McAFEE LAW FIRM, Norton, Virginia, for Appellant. Steven C. Rose, WEST & ROSE, Kingsport, Tennessee, Tariq A. Zaidi, PENNSTUART, Bristol, Tennessee, for Appellees. **ON BRIEF:** Timothy W. McAfee, McAFEE LAW FIRM, Norton, Virginia, for Appellant. M. Lacy West, Julia C. West, WEST & ROSE, Kingsport, Tennessee, Tariq A. Zaidi, Richard E. Ladd, Jr., PENNSTUART, Bristol, Tennessee, for Appellees.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Nancy Dickenson, as the conservator for Sandra Robinson, appeals the grant of summary judgment in favor of Cardiac and Thoracic Surgery of Eastern Tennessee, P.C. (C&T) and Dr. Robert Rosser in this diversity action for medical malpractice. The issue on appeal is whether the district court properly excluded the proffered testimony of Dickenson's medical experts. For the reasons set forth below, we **AFFIRM** the judgment of the district court with respect to C&T, **REVERSE** and **REMAND** for further proceedings with respect to Dr. Rosser, and **VACATE** the order excluding the testimony of Dr. John Penek.

1

# I.  BACKGROUND

Robinson underwent heart bypass surgery on November 10, 1998.  The surgery was performed by Dr. Richard Michalik, a cardiac surgeon employed by C&T.  Dr. Rosser, a pulmonologist, was called upon by Dr. Michalik to provide Robinson with postoperative respiratory care.  Following the removal of Robinson's ventilation tube, she suffered brain damage due to insufficient oxygen.  The lawsuit brought on Robinson's behalf alleged that her injuries were caused by the purportedly premature removal of her ventilation tube following surgery.

By consent of the parties, the case was assigned to a magistrate judge for disposition.  Summary judgment in favor of both defendants was granted on the ground that no witness for Robinson could competently testify concerning the standard of care applicable to either C&T or Dr. Rosser.  The plaintiff argues on appeal that the district court erred by not allowing cardiac surgeon W. Dudley Johnson, a practitioner from Wisconsin, and pulmonologist John Penek, a practitioner from New Jersey, to provide such testimony.  This timely appeal followed.

# II.  ANALYSIS

## A.      Standard of review

The district court's grant of summary judgment is reviewed de novo.  *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002).  Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Summary judgment was granted in favor of the defendants on the sole ground that the plaintiff failed to present admissible evidence concerning the standard of care applicable to either C&T or Dr. Rosser. *See Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 448 (6th Cir. 2002) ("A complete failure of proof concerning an essential element necessarily renders all other factors immaterial.").  Whether the district court's grant of summary judgment was proper consequently turns on the appropriateness of its decision to exclude the testimony of the plaintiff's experts.

## B.      The district court abused its discretion by excluding the testimony of Dr. Johnson regarding the alleged negligence of Dr. Rosser

Dr. Johnson stated in his affidavit that he is "involved with extubation decisions on almost a daily basis."  His curriculum vitae indicates that he has practiced as a cardio-thoracic surgeon since 1965, and that he has performed thousands of heart-related operations.  He explained his familiarity with the standard of care for postoperative cardiac patients in Kingsport, Tennessee as follows:

> (1) The published literature that explains the medical community; (2) Published information that describes the community in general; (3) My own knowledge and experience with the type of cardiac surgery being performed and the management of the patient post operatively; (4) Statements of Dr. Rosser and Dr. Michalik contained in their depositions wherein they describe the standard of care; (5) Statements of Dr. Rosser and Dr. Michalik contained in their depositions wherein they describe their educational background and training; and (6) Reviewing the medical records of Sandra Robinson.

Dr. Johnson elaborated on his experience with extubating postoperative patients in his deposition:

Q.   Over the past three years, how many patients have you managed that are on a ventilator that require in, in excess of a three day stay on the ventilator?

A.   The majority of my patients.

Q.   Okay, how many would that be?

A.   Maybe two hundred.

. . .

Q.   . . . [D]o you often request a pulmonary consult for your patients?

A.   Very commonly, yes.

Q.   Okay. And at what point would you request a pulmonary consult?

A.   Sometimes even pre-operatively if they have a long history of lung problems. I'll ask them to see them and follow with us together as we take care of the patients. And commonly afterwards. It could be anywhere. Right away or a day or two later if the patients are still in respiratory difficulty.

Q.   Okay. Who would make the decision to extubate a patient?

A.   Either can, and we haven't always agreed. And I've cancelled extubations on a number of occasions. And then there has been a rare case where the patient needs to be extubated and I do it. I don't, I mean, it's my patient and I can do whatever I want, but, but I would discuss it with the pulmonary person and we will discuss whether we think the patient is ready to be extubated or not.

. . .

Q.   Okay. Just take me through your process of determining . . . whether a patient can be extubated?

A.   On my patients it's rather uncommon to extubate them at the day of surgery. Most of them, as I mentioned, are long, difficult cases. I commonly spend ten to fourteen hours in surgery on my patients. There's so much to do with them. Post-operatively, the next day if blood gases are normal, the assist on the respirator is way down, he's moving air in and out well, his lung capacity is, very adequate on how much he can take a deep breath and breathe, he obviously, he or she is alert and neurologically intact. The cardiovascular system would be stable. Normal heart function. Normal blood pressure. Chest x-ray would certainly be satisfactory in terms of no diffuse infiltrates and better than, certainly not worse than what it had been before.

Despite Dr. Johnson's extensive experience, the district court did not allow him to testify regarding the medical services rendered by Dr. Rosser on the ground that Dr. Johnson's testimony was unreliable under the gatekeeping principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. The district court elaborated on its reasons in the following two paragraphs of its opinion:

Dr. Johnson's deposition testimony reveals that he is not competent to testify concerning the standard of care applicable to a pulmonologist at least as concerns extubation of a ventilation tube. Dr. Johnson, obviously, is a cardiac thoracic surgeon, not a pulmonologist; and he is

not trained in pulmonology. He has never qualified as an expert witness in a suit against a pulmonologist. Dr. Johnson's deposition revealed that he knows very little about ventilating medical equipment or the settings to be used. He has never written an article on pulmonology, and could not identify any articles about pulmonology which he has read. Looking to *Daubert*-type issues, there was no peer review regarding his opinion regarding Dr. Rosser's negligence. He could not identify what journals were authoritative that would be applicable to the facts surrounding plaintiff's condition. More importantly, he could not say what journals he read or considered in arriving at his opinion and his methodology. Also, at various points in his testimony he contradicted his affidavit. For example, he stated in his expert report that he examined the plaintiff's chest x-ray in arriving at his opinion. But during the deposition, he testified that he in fact never looked at the plaintiff's x-ray.

In sum, under *Daubert* and its progeny, expert testimony must meet a threshold requirement of reliability. There simply must be more than Dr. Johnson's bare assertion to show that Dr. Rosser deviated from the standard of care in Kingsport, Tennessee. The Court is not saying that a cardiac surgeon can never be a reliable expert when testifying in matters involving pulmonology, or even anesthesiology or some other medical specialty. However, the purported expert must demonstrate a familiarity with accepted medical literature or published standards in these other areas of specialization in order for his testimony to be reliable in the sense contemplated by Federal Rule of Evidence 702. For these reasons, the Motion for Summary Judgment of defendant Rosser shall likewise be GRANTED.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A district court's exclusion of expert testimony will not be set aside unless we determine that the court abused its discretion. *Gen'l Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) ("[T]he question of admissibility of expert testimony is . . . reviewable under the abuse-of-discretion standard."). An abuse of discretion is found where the reviewing court is "firmly convinced that a mistake has been made." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (quotation marks omitted) (defining the term "abuse of discretion" to mean that "the lower court relie[d] on clearly erroneous findings of fact, . . . improperly applie[d] the law[,] or use[d] an erroneous legal standard").

The district court appears to have relied most heavily upon its supposition that a "purported expert must demonstrate a familiarity with accepted medical literature or published standards in these other areas of specialization in order for his testimony to be reliable in the sense contemplated by Federal Rule of Evidence 702." This is an erroneous statement of the law. No authority was cited by the district court in support of its above-quoted statement regarding Rule 702, nor have we found any. In fact, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of *experience*." Fed. R. Evid. 702 advisory committee's note (2000 Amendments) (emphasis added); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility of the expert's testimony.") (quotation marks omitted); *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)

("There is no requirement that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness.") (quotation marks omitted).

The district court also noted that "Dr. Johnson's deposition revealed that he knows very little about ventilating medical equipment or the setting to be used." Presumably, the district court had in mind the following portion of Dr. Johnson's deposition testimony:

Q.	Okay. What type of ventilator do you use at your hospital?

A.	I don't know that. I don't generally run ventilators and adjust them.

Q.	Okay, and what mode of ventilation do you use on your patients on average?

A.	In terms of . . . ?

Q.	In terms of what mode and how that ventilator is getting oxygen to the patient?

A.	I don't know the different ventilators that I use.

Q.	Okay, well, I mean, are there no general modes of ventilation depending on whether you buy Brand A, Brand B, or Brand C?

A.	On the different ventilators, I can't tell you the difference in terms of ventilators.

Q.	Well, just tell me in general. What different modes are there to get oxygen to a patient?

A.	You just put it in under high pressure. You know, you have volume controls on the ventilators. You have gas control. Percentage of oxygen that you use to ventilate the patients.

Q.	What different modes of ventilation are there to get oxygen to a patient?

A.	You can intubate them, you can hook it up when they're ventilating that way on the ventilator. You can put a mask over their face. Some kind of, some degree of positive pressure on the mask.

The district court did not explain in its opinion how knowledge of the brand of ventilator used or its settings would affect the reliability of Dr. Johnson's testimony regarding the prematurity of the extubation, which is the issue in this case. Dr. Johnson's testimony regarding the timing of extubation, based on his extensive experience in making those decisions both with and without consultation from a pulmonologist, is not made unreliable by virtue of his inability to recall the mechanical details of the ventilator used in the operation. The timing of extubation is a separate issue from the mechanics of extubation.

As a further reason for its decision, the district court noted that "at various points in his testimony [Dr. Johnson] contradicted his affidavit." The only example offered, however, is that Dr. Johnson "stated in his expert report that he examined the plaintiff's chest x-ray in arriving at his opinion. But during the deposition, he testified that he in fact never looked at the plaintiff's x-ray." This apparent discrepancy is explained by the fact that although Dr. Johnson did not examine the x-ray film itself, he reviewed the radiologist's report, as indicated by the following deposition testimony:

A.	I didn't look at [the x-rays] because, as I've already said, there's staggering reasons not to extubate her, so I didn't need to go look for other reasons . . . .

Q.	Okay, so you, you didn't look at the films and consider these films?

A.      They were never sent to me.

. . .

Q.      But you obviously considered the chest x-rays, did you not?

A.      Yeah, the reports.

Q.      Okay. Well, what did you learn from the reports?

A.      Well, my impression on the reports, it was not a dramatic change.  There was something there, but certainly not catastrophic changes on the x-ray.

That Dr. Johnson reviewed the x-ray report rather than the x-ray film itself may go to the weight of his testimony before a jury, but it did not render Dr. Johnson's testimony so unreliable that his testimony should have been excluded altogether.

In sum, *Daubert*'s role of "ensur[ing] that the courtroom door remains closed to junk science," *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002), is not served by excluding testimony such as Dr. Johnson's that is supported by extensive relevant experience.  Such exclusion is rarely justified in cases involving medical experts as opposed to supposed experts in the area of product liability. *See generally* Daniel W. Shuman, *Expertise in Law, Medicine, and Health Care*, 26 J. Health Pol. Pol'y & L. 267 (2001) (characterizing the effect of the *Daubert* and *Kumho Tire* cases on claims of medical expertise as "[m]uch ado about little," while noting that these cases have had a significant effect on toxic tort and products liability litigation).  We therefore conclude that the district court abused its discretion by excluding Dr. Johnson's testimony regarding the medical services rendered by Dr. Rosser.

**C.      The district court did not abuse its discretion by excluding the testimony of Dr. Johnson regarding the alleged negligence of C&T**

As the district court noted, "Dr. Johnson professed that he relied upon the deposition testimony of Drs. Michalik and Rosser to underpin his knowledge of the standard of care applicable to cardiac surgeons [such as Dr. Michalik] in Kingsport, Tennessee."  Nothing in those depositions, however, supports Dr. Johnson's opinion that the cardiac surgeon is responsible for the pulmonologist's decision of when to extubate a patient.  At most, the deposition of Dr. Michalik indicates that the cardiac surgeon often makes the decision to extubate and that frequently such decisions are made collaboratively with a pulmonologist. In this case, however, the uncontroverted evidence establishes that Dr. Michalik called upon Dr. Rosser to "assume that responsibility" and "it was Dr. Rosser who ordered the extubation of the tube."

The lack of support for Dr. Johnson's opinion, coupled with the affidavits of five Kingsport, Tennessee physicians who explained that the practice in Kingsport is that "once a pulmonology consult is obtained, the pulmonologist assumes management of the patient's ventilation and extubation," convinced the district court that Dr. Johnson's opinion on this issue was unreliable.  In light of the lack of support for Dr. Johnson's opinion and the contrary evidence found in the affidavits of the local physicians, we conclude that the district court did not abuse its discretion by excluding this testimony.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").

**D.      The basis for excluding the testimony of Dr. Penek under Rule 37(c) of the Federal Rules of Civil Procedure is no longer pertinent**

In a March 5, 2003 order, the trial court excluded the expert testimony of Dr. Penek under Rule 37(c)(1) of the Federal Rules of Civil Procedure.  "The Federal Rules of Civil Procedure . . . apply to civil actions in the federal courts, regardless of whether jurisdiction is based on federal question or diversity of

citizenship." *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001). Rule 37(c)(1) states as follows:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

We review the exclusion of expert testimony pursuant to Rule 37(c)(1) under an abuse-of-discretion standard. *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000). "[W]here exclusion necessarily entails dismissal of the case, the sanction must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 (7th Cir. 2004) (quotation marks omitted). "The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Id.* at 758.

The district court refused to permit Dr. Penek to testify, explaining as follows:

> Serious prejudice would result if Dr. Penek were allowed to testify now. . . . The Court neither faults nor criticizes the efforts of plaintiff's counsel. But there is no good cause for yet another extension of time against these physicians. In the 1525 days between the plaintiff's injury and the filing of the present Motion [to waive the Tennessee locality rule (T.C.A. § 29-26-115(b)) and permit the testimony of Dr. Penek], the proof, if it exists, could and should have been marshaled. Even though the trial date, which was only two months away when the Motion was filed, has been moved, were the Court to grant the Plaintiff's request it would be the better part of another year for the defendants to finally go to trial. Because the scheduling order must have some meaning, particularly three years into a lawsuit, the Motion is DENIED.

Because a new trial date will be set once this case is remanded to the district court, the district court's conclusion that harm would flow to Dr. Rosser by further delay in the trial date if Dr. Penek were allowed to testify is no longer a consideration. We therefore conclude that the order excluding Dr. Penek's testimony should be vacated.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court with respect to C&T, **REVERSE** and **REMAND** for further proceedings with respect to Dr. Rosser, and **VACATE** the order excluding the testimony of Dr. Penek.