¶ 192.
MICHAEL J. GABLEMAN, J.
{concurring in the judgment). This is a review of a published decision of the court of appeals that affirmed the Grant County circuit court's[1] order denying Dr. Kay M. Balink's ("Dr. Balink") postverdict motion for a new trial. Seifert ex rel. Scoptur v. Balink, 2015 WI App 59, 364 Wis. 2d 692, 869 N.W.2d 493. Dr. Balink requested a new trial because (1) the circuit court erred by admitting the medical standard-of-care expert testimony of Dr. Jeffrey Wener ("Dr. Wener"); (2) counsel's statements during closing arguments unfairly prejudiced the verdict; and (3) the interests of justice require a new trial because the issues have not been fully tried.
*608 ¶ 193. This case requires us to interpret how the Daubert[2] standard as adopted in Wis. Stat. § 907.02(1) (2013-14)[3] applies to a standard-of-care expert in a medical malpractice case where the expert relies on his experience to show that his principles and methods, and the application thereof, are reliable.
¶ 194. I conclude that experience is sufficient to satisfy Daubert's reliability requirement provided the expert shows how his experience makes his opinion reliable. No medical literature is required provided this is done. Thus, Dr. Wener's opinion is admissible in this case because he showed how his experience made his opinion reliable, and the circuit court did not err when it admitted his testimony at trial. Consequently, the circuit court did not err when it denied Dr. Balink's motion for a new trial based on her argument that the circuit court erroneously admitted Dr. Wener's testimony.
¶ 195. Further, I conclude the circuit court did not err when it denied Dr. Balink's request for a new trial based on the effect of counsel's statements during closing argument.
¶ 196. I do not reach Dr. Balink's request for a new trial in the interests of justice as Dr. Balink bases the request on the inadmissibility of Dr. Wener's testimony and the effect of counsel's statements during closing arguments. I consider it unnecessary to reach her request because I conclude that the circuit court properly admitted Dr. Wener's testimony and the verdict was not unfairly prejudiced by counsel's statements.
*609 ¶ 197. Accordingly, I would affirm the decision of the court of appeals, and I concur in the court's judgment. I write separately, however, to express how I reach this result.
I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY
A. Ms. Seifert's Prenatal Care
¶ 198. Beginning on December 5, 2008, Dr. Ba-link assumed Ms. Seifert's prenatal care. As part of this prenatal care, Dr. Balink tracked Ms. Seifert's weight. Ms. Seifert weighed 269 pounds at the beginning of the pregnancy, which meant Ms. Seifert was obese. Over the course of her pregnancy, Ms. Seifert gained an additional 36 pounds, and by the time of delivery, she weighed 305 pounds.
¶ 199. Dr. Balink took regular fundal measurements in order to measure the baby's growth and to estimate its size. On occasion, Dr. Balink used ultrasounds, but typically, Dr. Balink used fundal measurements. When performing these fundal measurements, Dr. Balink placed a tape measure on Ms. Seifert's stomach and measured the distance from her pubic bone to the top of the fundus, the fundus being the top of her uterus.
¶ 200. As another aspect of Ms. Seifert's prenatal care, Dr. Balink monitored Ms. Seifert's glucose level. Here Dr. Balink used a one-hour glucose tolerance test in order to determine if Ms. Seifert's glucose level rose above a 140 mg/dL threshold. If Ms. Seifert's glucose level rose above the 140 mg/dL threshold, Dr. Balink would have performed a three-hour glucose tolerance test to determine if Ms. Seifert had gestational diabe *610 tes. Because Ms. Seifert's glucose level was 131 mg/dL, Dr. Balink considered Ms. Seifert's glucose level safe and never ran the diagnostic test to determine if in fact Ms. Seifert had gestational diabetes.
B. Braylon Seifert's Delivery
¶ 201. On May 26, 2009, Dr. Balink ordered Ms. Seifert's labor be induced. In the induction order, Dr. Balink noted that Ms. Seifert's baby was "expected LGA," meaning large for gestational age. Again using a fundal height measurement, Dr. Balink estimated the baby's weight at eight pounds, eight ounces. Dr. Balink did not order an ultrasound, a more accurate method of measuring the baby's size, despite her awareness of the complicating factors of Ms. Seifert's obesity and the possibility of the LGA child.
¶ 202. Ms. Seifert arrived at the hospital for induction of labor on May 28, 2009. After she had been pushing for one hour without making progress in delivering her baby, Ms. Seifert tired, and Dr. Balink decided to use a vacuum device on the baby's head for assistance. Braylon Seifert's ("Braylon") head emerged when Dr. Balink used the vacuum, but shortly thereafter, it retracted. This type of retraction, known as the "turtle sign," indicates shoulder dystocia, which essentially means the baby's shoulder is caught on the mother's pubic bone. Thus, after seeing Braylon's head retract, Dr. Balink quickly diagnosed Braylon with shoulder dystocia.
f 203. Shoulder dystocia can be a life-threatening emergency if not swiftly resolved. This is so because a baby experiencing such a condition cannot breathe properly. In an effort to resolve the situation as quickly as possible, Dr. Balink attempted a variety of *611 maneuvers to safely deliver Braylon. Eventually she succeeded by using traction to dislodge Braylon's shoulder and pull him out. At 12:24 a.m. on May 29, 2009, Braylon was born. He weighed nine pounds, twelve ounces. Only a few minutes had elapsed from the time Dr. Balink diagnosed the shoulder dystocia to the time she delivered Braylon, and it appeared that the situation had been successfully resolved with no permanent harm to the baby. However, Braylon was diagnosed just days later with a permanent brachial plexus injury in his left arm that inhibits its growth and use. Braylon has since undergone surgery to improve the use of his left arm, but even with surgery and therapy, he will never have full use of his arm.
C. Dr. Balink's Trial for Medical Malpractice
¶ 204. After discovering Braylon's permanent brachial plexus injury, Braylon's parents (David and Kimberly) and his guardian ad litem (Paul J. Scoptur) sued Dr. Balink and Proassurance Wisconsin Insurance Co. on Braylon's behalf alleging that Dr. Balink was (1) negligent in providing Ms. Seifert's prenatal care; (2) negligent in delivering Braylon; and (3) failed to obtain Ms. Seifert's informed consent before using the vacuum to assist with the delivery.
1. Dr. Wener's Opinion on the Standard of Care
¶ 205. Braylon's parents and guardian ad litem hired Dr. Wener, a board certified obstetrician-gynecologist, to testify as to the standard of care required of Dr. Balink as a family practitioner and Dr. Balink's breach of that standard of care. According to Dr. Wener, Dr. Balink fell below the standard of care because (1) she did not use an ultrasound to estimate *612 Braylon's weight prior to delivery despite Ms. Seifert's obesity and Braylon's suspected LGA status; (2) she never ordered the three-hour glucose tolerance test to determine if Ms. Seifert did in fact have gestational diabetes even though Ms. Seifert was obese and had gained more weight than would be expected over the course of her pregnancy; and (3) she used a vacuum to assist in the delivery in spite of the presence of an increased risk for shoulder dystocia.[4]
f 206. To form both his opinion of the applicable standard of care as well as his opinion that Dr. Balink had breached that standard of care, Dr. Wener considered the following factors: (1) Ms. Seifert's prepreg-nancy weight of269 pounds; (2) Ms. Seifert's 36-pound weight gain over the course of her pregnancy; (3) the 131 mg/dL result from the 1-hour glucose tolerance test; and (4) Braylon's estimated fetal weight of 8 pounds, 8 ounces. Dr. Wener opined that, as a result of the confluence of these factors, Braylon was at an increased risk for shoulder dystocia. Furthermore, Dr. Wener testified that Dr. Balink fell below the applicable standard of care because her conduct did not account for the increased risk created by the factors presented by Ms. Seifert and her unborn child.
¶ 207. Dr. Wener testified that a family practitioner practicing obstetrics in accordance with the applicable standard of care in 2009 would have recognized that Ms. Seifert's obesity and above-average weight gain would have rendered a fundal measurement too inaccurate for the situation and would have instead ordered an ultrasound in order to estimate the baby's *613 size. Obtaining a more accurate measurement would, in turn, have indicated to Dr. Balink that the vacuum device should not be used on a baby of Braylon's size because of the risk of shoulder dystocia. In addition, Dr. Wener opined that a family practitioner practicing obstetrics in 2009 should have used a lower threshold than Dr. Balink used—130 mg/dL as opposed to 140 mg/dL—when performing the 1-hour glucose tolerance test because of Ms. Seifert's weight, which increased the risk of gestational diabetes. Finally, Dr. Wener opined that, to meet the applicable standard of care, a family practitioner practicing obstetrics in 2009 would avoid use of a vacuum device during the delivery because of the increased risk of shoulder dystocia resulting from Ms. Seifert's weight and Braylon's suspected status as a large baby.
2. Dr. Balink's Challenge to Dr. Wener's Opinion on the Standard of Care
¶ 208. Before trial, Dr. Balink challenged the admissibility of Dr. Wener's opinion, arguing that his opinion was unreliable because it was based not on science and medical literature but rather was based solely on Dr. Wener's personal preferences. At a pretrial hearing to address, inter alia, the admissibility of Dr. Wener's opinion, the circuit court determined Dr. Wener used a "holistic" method whereby Dr. Wener looked at the patient as a whole using recognized factors in order to come to a conclusion about the standard of care required. In support of its decision to admit Dr. Wener's opinion, the circuit court pointed to "the vagaries of medical treatment and diagnosis" and emphasized that Dr. Wener does not represent the junk science Daubert was intended to exclude. Thus, *614 the circuit court ruled that Dr. Wener's opinion testimony was admissible, and the case proceeded to trial.
3. Closing Arguments
¶ 209. At trial, Kenneth M. Levine ("Atty. Levine"), the Seiferts' counsel, made a series of statements during closing arguments that Dr. Balink argues require a new trial because the statements were improper and unfairly prejudiced the verdict. First, Dr. Balink says Atty. Levine compared Dr. Wener's opinion about the standard of care required of Dr. Balink as a family practitioner to the standard of care required of an ordinary person while driving. Dr. Balink's counsel objected to these statements as a violation of the "rules of the road prohibition" put in place by the circuit court in a ruling on a motion in limine. The circuit court's ruling stated that Atty. Levine could not compare medical negligence to ordinary negligence. Second, Atty. Levine asked the jurors on three occasions how they would like their doctors to care for them, and in so doing, Dr. Balink argues Atty. Levine violated the "golden rule prohibition." At the time of the first violation, Atty. Levine withdrew his statement in response to the objection made by Dr. Balink's counsel; at the time of the second violation, the circuit court gave a brief curative instruction; and at the time of the third violation, the circuit court sustained the objection made by Dr. Balink's counsel. Third, in his rebuttal argument, Atty. Levine made a statement that he thought more highly of the jurors than Dr. Balink's counsel and another statement that he thought the jurors were well equipped to decide the case and were experts in their own right.
*615 4. Dr. Balink's Motion for a New Trial
¶ 210. Following the verdict, Dr. Balink moved the circuit court for a new trial based on three arguments. First, Dr. Balink argued the circuit court erred when it admitted Dr. Wener's testimony. Second, the cumulative effects of Atty. Levine's statements during closing arguments unfairly prejudiced the verdict. Third, the interests of justice required a new trial because the issues were not fully tried due to the erroneous admission of Dr. Wener's testimony and the effect of Atty. Levine's improper statements during closing arguments.
f 211. At the hearing to address Dr. Balink's motion for a new trial, the circuit court again determined that Dr. Wener's opinion was admissible.[5] The circuit court noted Dr. Wener's method was grounded in science and further that his method can be tested. In regard to the nature of Dr. Wener's testimony, the circuit court observed, " [I]t is not in the nature of engineering or other more hard sciences. It is not a mathematical calculation wherein one plus one plus one always yields three. Sometimes it yields 3.2 and sometimes it yields 2.8." Further, in light of the expert testimony Dr. Balink introduced at trial, it was more firmly assured of the admissibility of Dr. Wener's testimony because there were points on which Dr. Balink's experts agreed with Dr. Wener.
¶ 212. The circuit court also found that neither Atty. Levine's statements, nor their cumulative effect, required an order for a new trial. The circuit court *616 determined that the first set of statements did not violate the motion in limine, even though it was close. In reaching its conclusion, the circuit court noted that the jury was instructed on medical negligence, not ordinary negligence; therefore, the jury was unlikely to see the comparison between the two types of negligence given that the jury had not been instructed on ordinary negligence. For the second set of statements, the circuit court found that the sustained objection of Dr. Balink's counsel and curative instruction given by the court were sufficient to eliminate any unfair prejudice. Finally, for the third set of statements, the circuit court found the context—rebuttal argument— important because Atty. Levine's statements were made in response to statements made by Dr. Balink's counsel during closing arguments. In addition, the circuit court determined that Atty. Levine employed an argument technique meant to empower the jury and give it confidence to decide the case. Therefore, these statements were not improper. Thus, the effect of Atty. Levine's statements did not require a new trial.
¶ 213. The circuit court then denied Dr. Balink's request for a new trial.
5. Dr. Balink's Appeal
¶ 214. Dr. Balink appealed, and the court of appeals affirmed the circuit court determining that it did not err when it denied Dr. Balink's request for a new trial. Seifert, 364 Wis. 2d 692, ¶ 3. Relying heavily on the discretion afforded to circuit courts in the Daubert analysis, the court of appeals determined the circuit court properly exercised its discretion in admitting Dr. Wener's opinion. Id., ¶¶ 23-27, 34. Then, pointing out that Dr. Balink failed to move for a mistrial before the verdict, the court of appeals deter *617 mined that the circuit court did not err when it denied Dr. Balink's request for a new trial based on the effect of Atty. Levine's statements during closing arguments. Id., ¶¶ 36 n.10, 37. The court of appeals next addressed Dr. Balink's request for a new trial in the interests of justice stating that the issues were fully tried and no new trial was needed. Id., ¶ 49 n.12.
¶ 215. Dr. Balink then petitioned this court for review, and because we have yet to address the adoption of the Daubert standard in Wisconsin, we granted review to take the opportunity to define the reliability analysis for a standard-of-care expert in a medical malpractice case.
II. STANDARD OF REVIEW
¶ 216. Before discussing the standard of review it is important to note that while Daubert has imposed change in some areas of the law concerning expert testimony, it has not changed the standard of review in such cases. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-43 (1997). Thus, review of a circuit court's decision to admit or exclude expert testimony follows the same standards previously used before the legislature adopted the Daubert standard in 2011.
¶ 217. This court reviews a circuit court's decision to admit or exclude expert testimony for an erroneous exercise of discretion. State v. Kandutsch, 2011 WI 78, f 23, 336 Wis. 2d 478, 799 N.W.2d 865. "The circuit court has 'broad discretion to admit or exclude evidence,' " and this court upholds the circuit court's decision unless it failed to apply the proper legal standard or the record lacks reasonable support for its decision. Id. (quoting State v. Nelis, 2007 WI 58, *618 ¶ 26, 300 Wis. 2d 415, 733 N.W.2d 619; Martindale v. Ripp, 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W2d 698).
¶ 218. In order to determine whether the circuit court erroneously exercised its discretion, this court must first interpret the Daubert standard as adopted by the legislature in Wis. Stat. § 907.02(1) and determine if the circuit court used the proper legal standard when it analyzed Dr. Wener's testimony. Statutory interpretation is a question of law this court reviews de novo. State v. Hemp, 2014 WI 129, ¶ 12, 359 Wis. 2d 320, 856 N.W.2d 811. Should this court interpret § 907.02(1) and conclude that the circuit court used the proper legal standard, "the [circuit] court's choice of relevant factors within [the Daubert] framework and its ultimate conclusion as to admissibility" is reviewed for an erroneous exercise of discretion. Lees v. Carthage Coll., 714 F.3d 516, 520 (7th Cir. 2013).
¶ 219. As with evidentiary rulings, this court reviews a circuit court's ruling on a motion for a new trial for an erroneous exercise of discretion. Wagner v. Am. Family Mut. Ins., 65 Wis. 2d 243, 249—50, 222 N.W.2d 652 (1974).
III. DISCUSSION
¶ 220. First, I consider the admissibility of Dr. Wener's opinion and conclude that the circuit court properly exercised its discretion when it admitted Dr. Wener's opinion. In so concluding, I further conclude the circuit court properly exercised its discretion in denying Dr. Balink's request for a new trial. Second, I consider the effect of Atty. Levine's statements during closing arguments and conclude the circuit court properly exercised its discretion when it found the effect of *619 the statements did not require a new trial. As noted above, I do not reach Dr. Balink's argument for a new trial in the interests of justice because the circuit court properly admitted Dr. Wener's testimony and Atty. Levine's statements do not require a new trial. Thus, the issues were fully tried, and there is no reason to grant a new trial in the interests of justice under Wis. Stat. § 751.06.
A. The Admissibility of Dr. Wener's Testimony
1. The Governing Statute
¶ 221. The admissibility of expert testimony is governed by Wis. Stat. § 907.02(1):
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.
(Emphasis added). This last part of the statute, emphasized above, was added by the legislature in 2011, see 2011 Wis. Act 2, § 34m, and it is this addition that I address today.
¶ 222. In addressing the addition to § 907.02(1), I first look at the standard previously followed in Wisconsin and then look to federal law for guidance on how Federal Rule 702 ("Rule 702") and Daubert have been interpreted and applied in the federal courts. Next, I evaluate Dr. Wener's testimony and the circuit court's *620 analysis of his testimony in order to determine whether the circuit court erred in determining that Dr. Wener's principles and methods meet the reliability standards set forth. After concluding that Dr. Wener's principles and methods are reliable, I then evaluate if his principles and methods were reliably applied.
2. The Relevancy Standard and Wisconsin's Adoption of the Daubert Standard
¶ 223. Traditionally, Wisconsin followed the relevancy standard as articulated in State v. Walstad, 119 Wis. 2d 483, 515-16, 351 N.W.2d 469 (1984), to determine the admissibility of expert testimony. Under this standard, the expert needed only to be qualified, helpful, and relevant in order to be permitted to testify. Id. at 516. Reliability was considered a credibility determination left for the jury. State v. Fischer, 2010 WI 6, ¶ 2, 322 Wis. 2d 265, 778 N.W.2d 629. When confronted with the opportunity to replace the relevancy standard with the Daubert standard followed in federal courts, this court confirmed adherence to the relevancy standard. E.g., Fischer, 322 Wis. 2d 265, ¶ 7. Not until the legislature amended the statute governing expert testimony in 2011 to add the language emphasized above did Wisconsin adopt the Daubert standard followed in federal courts. See 2011 Wis. Act 2, § 34m. Thus, because our statute governing the admissibility of expert testimony now mirrors Rule 702, compare Wis. Stat. § 907.02(1), with Fed. R. Evid. 702, we may look to federal law interpreting the Daubert standard for guidance concerning how we should apply the standard in Wisconsin, State v. Gudenschwager, 191 Wis. 2d 431, 439, 529 N.W.2d 225 (1995).
*621 3. Federal Rule of Evidence 702 and the Daubert Standard
¶ 224. Rule 702 contains five inquiries for a district court to make before admitting expert testimony. Fed. R. Evid. 702. All of these inquiries must be met by a preponderance of the evidence. Id. advisory committee notes (2000 amend.). First, the witness must be qualified. Lees, 714 F.3d at 521. Essentially this means that the witness must possess specialized knowledge, which is something Wisconsin has required for expert testimony before the legislature amended Wis. Stat. § 907.02(1). Second, the witness's testimony must be helpful, meaning it must assist the trier of fact. Lees, 714 F.3d at 521. This element closely relates to the relevance requirement previously followed in Wisconsin. Third, the witness's testimony must be based on sufficient facts and data. Id. Fourth, the witness must have reliable principles and methods, and fifth, those principles and methods must be reliably applied to the facts of the case. Id. at 521-22.1 address the fourth and fifth elements today because these elements are new to Wisconsin law with the legislature's adoption of the Daubert standard and are the elements at issue in this case.
4. The Reliability Analysis
¶ 225. In order to assist with the reliability analysis required by the fourth and fifth elements (reliable principles and methods reliably applied to the facts of the case), the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993), articulated four non-exhaustive factors courts could use to analyze the reliability of expert testimony: (1) whether the method has been or will be *622 tested; (2) whether the method "has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether the method has been generally accepted. In articulating these factors, the Court emphasized the factors are flexible and do not represent all the factors a court could possibly consider. Id. at 594. In fact,
a trial court may consider one or more of the more specific factors that Daubert mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in Daubert, the test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.
Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999). "[T]here are many different kinds of experts and many different kinds of expertise, including experts in drug terminology, handwriting analysis, land valuation, agricultural practices, railroad procedures, and so forth." United States v. Brumley, 217 F.3d 905, 911 (7th Cir. 2000). Therefore, the reliability analysis must be flexible enough to allow the circuit court to assess the type of expert being evaluated.
¶ 226. As a result of the different kinds of experts, courts developed additional factors—many of which are listed in the Advisory Committee Notes of Rule 702—for analyzing the reliability of an expert's opinion as the situation required. In some of these situations, particularly those involving specialized knowledge, courts used an expert's experience to determine reliability. See Kumho Tire, 526 U.S. at 150. *623 Rule 702 expressly allows for the use of an expert's experience, and the Advisory Committee Notes say:
Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.
Fed. R. Evid. 702 advisory committee notes (2000 amend.) (emphasis added). In fact, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Id. Therefore, when assessing reliability, a circuit court should have flexibility to use different reliability factors, including the expert's experience, to analyze whether the expert's opinion is reliable. As the Court pointed out in Kumho Tire,
[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from ... specialized experience." And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own."
526 U.S. at 148-49 (alteration in original) (emphasis added) (citation omitted) (quoting Learned Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901)).
¶ 227. In general, when assessing reliability, a circuit court is looking for "good grounds" for the expert's opinion to show that it is "more than subjec *624 tive belief or unsupported speculation" and demonstrates "a reliable basis in the knowledge and experience of his discipline." Daubert, 509 U.S. at 590, 592. Therefore, whatever factors a court uses to assess an expert's reliability, the factors, and the court's analysis, must ensure the expert has good grounds for his or her opinion. In addition, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595. Thus, if a circuit court finds that an expert has good grounds for his opinion, it is for the jury to decide between competing conclusions.
5. The Reliability Analysis in the Medical Standard-of-Care Context
¶ 228. When assessing a medical standard-of-care expert, other jurisdictions have found good grounds for the expert's opinion when the expert had experience that demonstrated familiarity with the type of medicine at issue and the standard of care for that type of medicine. For example, the Third Circuit concluded a doctor's testimony was based on good grounds and the district court abused its discretion in excluding the doctor's standard-of-care testimony because the doctor no longer practiced as an interven-tional cardiologist and now practiced as an invasive cardiologist. Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 399-400 (3d Cir. 2003). As an invasive cardiologist, the doctor still interacted with, and even advised, interventional cardiologists, which, along with his past experience as an invasive cardiologist, was sufficient to satisfy Daubert. Id. at 406-07. Therefore, the Third Circuit concluded the expert was *625 sufficiently familiar with the type of medicine involved in the case such that he could reliably testify to the standard of care.
¶ 229. The Sixth Circuit reached a similar conclusion in Dickenson v. Cardiac & Thoracic Surgery of Eastern Tennessee, P.C., 388 F.3d 976, 978-82 (6th Cir. 2004), when it concluded the district court abused its discretion in excluding a cardio-thoracic surgeon's testimony regarding the standard of care required for a pulmonologist. There, the court concluded the district court abused its discretion by not allowing the doctor to testify as to the standard of care based on the doctor's extensive experience and familiarity with the pulmonology issue involved in the case. Id. at 980-82.
¶ 230. As Hippocrates, the father of medicine, noted in his writing On the Art of Medicine, clinical medicine is an art that requires good judgment developed over time and through experience. Put another way, "medicine is scientific, but not entirely a science." Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010). As the Sixth Circuit noted,
Daubert's role of "ensur[ing] that the courtroom door remains closed to junk science," is not served by excluding testimony such as [the doctor's] that is supported by extensive relevant experience. Such exclusion is rarely justified in cases involving medical experts as opposed to supposed experts in the area of product liability.
Dickenson, 388 F.3d at 982 (alteration in original) (citation omitted) (quoting Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002)).
*626 6. Determining the Reliability of Dr. Wener's Principles and Methods
¶ 231. With the foregoing in mind, we now turn to the question of whether Dr. Wener's principles and methods are reliable such that he can testify about the standard of care applicable to Dr. Balink.
i. Identifying Dr. Wener's Principles and Methods
¶ 232. In order to answer the question before us, namely whether Dr. Wener's testimony is admissible under Daubert, the first step is to identify the principles and methods Dr. Wener employed. The circuit court found Dr. Wener used a "holistic," or comprehensive, method of determining the standard of care applicable to Ms. Seifert. Essentially, this comprehensive method amounts to an expert physician examining the patient as a whole, determining what, if any, of the risk factors recognized by the medical community are present within the patient, and then using that expert physician's experience to interpret the risk factors and arrive at the standard of care required. It is, as it must be, a case-by-case method to determine what type of care is appropriate for a particular patient.
¶ 233. Here, Dr. Wener identified the following risk factors recognized by the medical community: (1) Ms. Seifert's prepregnancy weight of 269 pounds; (2) Ms. Seifert's 36-pound weight gain over the course of her pregnancy; (3) the 131 mg/dL result from the one-hour glucose tolerance test; and (4) Braylon's estimated fetal weight. As his method, Dr. Wener used his experience to determine that these factors indicated that Ms. Seifert's baby was at an increased risk for *627 shoulder dystocia and that Dr. Balink fell below the standard of care because she did not account for this increased risk.
ii. Assessing Reliability
¶ 234. Now that we have identified Dr. Wener's principles and methods, we must determine if they are reliable and reliably applied. In this case, I conclude that the circuit court did not err when it found Dr. Wener's principles and methods are sufficiently reliable and reliably applied. Dr. Wener showed how his experience made his methodology reliable and demonstrated, through his experience, an understanding of the applicable standard of care in a way that he can reliably opine about the standard of care required. Dr. Wener testified that he delivered 7,500 to 8,000 babies, encountered shoulder dystocia, and even brachial plexus injuries, which shows that Dr. Wener is experienced with the type of medical practice at issue in this case. This experience in turn makes his comprehensive methodology reliable because Dr. Wener has used his factors and his methods in treating his own patients. Dr. Wener also testified that he has experience as Chairman of the Department of Obstetrics and Gynecology at Saint Alexius Medical Center. Part of his responsibilities as Chairman required reviewing the work of other doctors and setting the quality of care for the hospital. In addition, Dr. Wener testified that he taught medical students at the University of California San Diego, and he was named "One of Chicago's Top Doctors" by his peers. This testimony demonstrates an understanding of the applicable standard of care by showing Dr. Wener is familiar with the medical community and more than just his own practice. When tailoring the reliability analysis to a medical standard- *628 of-care expert, good grounds may come from the expert's own experience provided that experience has made him or her familiar with the type of medicine at issue. Dr. Wener shows that here, and therefore the circuit court did not err when it found his testimony reliable.
¶ 235. Further, the circuit court undertook a thoughtful analysis of the admissibility of Dr. Wener's testimony that shows it considered the reliability factors in order to determine good grounds for Dr. Wener's opinion. It noted that Dr. Wener is not the kind of junk scientist Daubert sought to exclude and Dr. Wener's decision not to use medical literature was acceptable because the individualized nature of a determination made when caring for a particular patient is not something that can be published or peer reviewed. Also, the circuit court correctly found that Dr. Wener's method had an aspect of testability to it because the factors he relied on were, indeed, capable of being tested. Although it prudently and accurately observed that the nature of the case was "not in the nature of engineering or other more hard sciences," the circuit court properly admitted Dr. Wener's opinion based on Dr. Wener's experience.
¶ 236. Indeed, I emphasize that the circuit court does have and must have discretion to apply the Daubert analysis so as to fit the facts of each particular case, as the circuit court did here. See Kumho Tire, 526 U.S. at 150 ("Our emphasis on the word 'may' thus reflects Daubert's description of the Rule 702 inquiry as 'a flexible one.' Daubert makes clear that the factors it mentions do not constitute a 'definitive checklist or test.[1] And Daubert adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.' " (citations omitted) (quoting Daubert, 509 U.S. at 591, *629 593-94)). However, this discretion does not allow the circuit court to abdicate its role as gatekeeper in performing the reliability analysis. Id. at 158-59 (Scalia, J., concurring) ("[T]he discretion [the Court] endorses—trial-court discretion in choosing the manner of testing expert reliability—is not discretion to abandon the gatekeeping function. . . . Rather, it is discretion to choose among reasonable means of excluding expertise that is fausse and science that is junky.").
¶ 237. As is evident by the circuit court's discussion of the Daubert factors, it did not abdicate its role as gatekeeper when admitting Dr. Wener's testimony; instead, the analysis indicates the circuit court thoughtfully and carefully considered the Daubert factors before turning to other considerations. The circuit court used its discretion to tailor its analysis to the type of expert we have here, namely a medical standard-of-care expert, and it looked to Dr. Wener's experience in order to determine reliability. In so doing, it noted that Dr. Wener used factors recognized by the medical community that he then "added up" based on his own experience with delivering babies, dealing with shoulder dystocia, and setting the quality of care at his hospital to reach a conclusion as to the standard of care required here. This, the circuit court said, made Dr. Wener's opinion reliable, and I see no error in this conclusion.
7. Dr. Balink's Arguments
f 238. Dr. Balink makes two main arguments as to the unreliability of Dr. Wener's opinion. First, she argues that Dr. Wener's testimony is based on nothing but his personal preferences, and second, she argues that Dr. Wener's failure to ground his testimony in any *630 published medical literature makes his testimony unreliable. I address each argument in turn.
i. Dr. Wener's Opinion Is More than Personal Preference
¶ 239. First, Dr. Balink argues Dr. Wener has nothing but his personal preferences to support his conclusion as to the standard of care and Dr. Balink's breach of that standard of care. Thus, his opinion is unreliable because it reflects only what Dr. Wener would do and not what the reasonable family practitioner practicing obstetrics in 2009 would do. While it may be true that Dr. Wener practices medicine in the manner he set forth as the applicable standard of care, that fact, standing alone, does not transform his opinion into a statement of personal preference. Dr. Wener assisted in setting the quality of care required at Saint Alexius Medical Center while he served there as Chairman of the Department of Obstetrics and Gynecology. Furthermore, Dr. Wener taught medical students and was named "One of Chicago's Top Doctors" by his peers. At least one other court has reached a similar conclusion when presented with the question of how to determine if a medical standard-of-care expert's testimony is reliable based on his experience. In Ellison v. United States, 753 F. Supp. 2d 468, 480-81 (E.D. Pa. 2010), the court dismissed the United States' argument that the standard-of-care expert based his opinion on his personal preferences because, "[t]aken as a whole, Dr. Super's testimony is that he has formulated an opinion as to the general—as opposed to simply his own, personal—standard of care and that, based on his experience, he had a reliable basis for doing so."
*631 ii. There Is No Medical Literature Requirement
¶ 240. Second, Dr. Balink argues that Dr. Wen-er's failure to rely on published medical literature makes his opinion unreliable. However, as the Third Circuit noted when it addressed medical literature in the context of differential diagnosis,
[i]n the actual practice of medicine, physicians do not wait for conclusive, or even published and peer-reviewed, studies to make diagnoses to a reasonable degree of medical certainty. Such studies of course help them to make various diagnoses or to rule out prior diagnoses that the studies call into question. However, experience with hundreds of patients, discussions with peers, attendance at conferences and seminars, detailed review of a patient's family, personal, and medical histories, and thorough physical examinations are the tools of the trade, and should suffice for the making of a differential diagnosis even in those cases in which peer-reviewed studies do not exist to confirm the diagnosis of the physician.
Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999); see also Dickenson, 388 F.3d at 980 (calling the district court's imposition of a medical literature requirement for a medical expert "an erroneous statement of the law"); Schneider, 320 F.3d at 406 ("Where there are other factors that demonstrate the reliability of the expert's methodology, an expert opinion should not be excluded simply because there is no literature on point."); Kudabeck v. Kroger Co., 338 F.3d 856, 862 (8th Cir. 2003) ("[PJublication is not a prerequisite for admissibility."). The Court itself noted in Daubert that " [publication ... is not a sine qua non of admissibility." Daubert, 509 U.S. at 593. Thus, there simply is no medical literature requirement of the kind Dr. Balink suggests, and an expert's decision not to rely on *632 literature does not render his opinion unreliable provided the expert has something else, like his experience, to make his opinion reliable. Thus, because there is no requirement that an expert physician's testimony be based in whole or in part on medical literature and Dr. Wener showed how his experience makes his opinion reliable, the circuit court did not err when it admitted Dr. Wener's testimony.
¶ 241. It is true that Dr. Balink produced medical literature in this case that seemingly contradicted Dr. Wener's opinion, particularly regarding the threshold to use for the one-hour glucose tolerance test; however, Dr. Wener was able to meet that literature and provide an explanation for why, based on his experience, he did not agree with it. Thus, the presence of this literature does not render Dr. Wener's testimony unreliable as a matter of law, as Dr. Balink argues. Such a conflict of evidence boils down to an issue of credibility, requiring determination by the trier of fact. "Daubert makes the [circuit] court a gatekeeper, not a fact finder." United States v. Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir. 2006).
8. Determining the Reliable Application of Dr. Wener's Principles and Methods
¶ 242. Last in the Daubert analysis, I determine that Dr. Wener reliably applied his comprehensive method to the facts of this case.
¶ 243. Under the Daubert analysis, we are to look for reliable principles and methods and a conclusion that logically follows from those reliable principles and methods. See Joiner, 522 U.S. at 144-46. If the expert's conclusion logically follows from reliable prin *633 ciples and methods, any inconsistencies,[6] or flaws, go to the weight, or credibility, of the expert's testimony as opposed to its admissibility. See Lees, 714 F.3d at 525.
¶ 244. Such is the case here. As detailed above, Dr. Wener had a reliable method of determining the standard of care applicable to this case because of his experience. His conclusion that Dr. Balink breached that standard of care logically follows from that method. Thus, the inconsistencies Dr. Balink points to in her brief as examples of an unreliable application go to the weight to be given to Dr. Wener's testimony and not to the question of its admissibility. When assessing expert testimony, we are looking for good grounds, not flawless grounds. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.
¶ 245. "[W] hen an expert purports to apply principles and methods in accordance with professional standards, and yet reaches a conclusion that other experts in the field would not reach, the [circuit] court may fairly suspect that the principles and methods have not been faithfully applied." Fed. R. Evid. 702 advisory committee notes (2000 amend.). This is not the case here, and Dr. Wener's testimony may not be *634 excluded because, as the circuit court noted in the postverdict motion hearing, Dr. Balink's experts agreed with Dr. Wener in some respects. Thus, the circuit court did not have reason to exclude Dr. Wener's testimony because the record discloses no reason to suspect that Dr. Wener's application of his principles and methods to the facts of this case was unreliable.
¶ 246. In some cases the expert's conclusion bears on the reliability analysis because "conclusions and methodology are not entirely distinct from one another." Joiner, 522 U.S. at 146. For example, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Id. However, provided the conclusions of the respective expert physicians logically follow from their methods and there is no analytical gap between the two, a court is not to choose between the differing conclusions of two experts; such a determination is left for the jury. See id. But this is not the case with Dr. Wener's testimony despite the fact that Dr. Balink presented contradictory medical literature and comes to a different conclusion. Thus, Dr. Wener's conclusion does not render his testimony inadmissible because it differs from Dr. Balink's conclusion.
¶ 247. In sum, I conclude that Dr. Wener's opinion is admissible. His comprehensive method is reliable and reliably applied. This is a result of his extensive experience that supports his opinion, and the circuit court did not err when it found Dr. Wener's testimony admissible. Thus, Dr. Balink's request for a new trial based on the erroneous admission of Dr. Wener's testimony was properly denied.
*635 B. Counsel's Statements During Closing Arguments
¶ 248. Dr. Balink next argues that the circuit court erroneously denied her motion for a new trial because the effect of Atty. Levine's improper statements during closing arguments unfairly prejudiced the verdict.
¶ 249. Before addressing this argument, I first note that I conclude that Dr. Balink waived this argument by failing to move for a mistrial. See Wagner, 65 Wis. 2d at 249. However, like the court of appeals, I choose to address this argument under the court's discretionary jurisdiction.
¶ 250. A motion for a new trial based on unfairly prejudicial statements by counsel "is addressed to the discretion of the trial court." Id. at 249-50; see also Rodriguez v. Slattery, 54 Wis. 2d 165, 170-71, 194 N.W.2d 817 (1972) ("The trial court is in a particularly good 'on-the-spot' position to evaluate these factors."). Thus, we are bound to uphold the circuit court's decision unless the circuit court erroneously exercised its discretion. See Klein v. State Farm Mut. Auto. Ins., 19 Wis. 2d 507, 511, 120 N.W.2d 885 (1963).
¶ 251. Here, the circuit court gave an account of its reasoning. I see no reason to say the circuit court erroneously exercised its discretion by denying Dr. Balink's motion for a new trial.
IV. CONCLUSION
¶ 252. In this instance, I conclude that experience is sufficient to satisfy Daubert's reliability requirement provided the expert shows how his experience makes his opinion reliable. No medical literature is required provided this is done. Thus, Dr. Wener's *636 opinion is admissible in this case because he showed how his experience made his opinion reliable, and the circuit court did not err when it admitted his testimony at trial. Consequently, the circuit court did not err when it denied Dr. Balink's motion for a new trial based on her argument that the circuit court erroneously admitted Dr. Wener's testimony.
¶ 253. Further, I conclude the circuit court did not err when it denied Dr. Balink's request for a new trial based on the effect of counsel's statements during closing argument.
¶ 254. I do not reach Dr. Balink's request for a new trial in the interests of justice as Dr. Balink bases the request on the inadmissibility of Dr. Wener's testimony and the effect of counsel's statements during closing arguments. I consider it unnecessary to reach her request because I conclude that the circuit court properly admitted Dr. Wener's testimony and the verdict was not unfairly prejudiced by opposing counsel's statements.
¶ 255. Accordingly, I would affirm the decision of the court of appeals, and I concur in the court's judgment. I write separately, however, to express how I reach this result.
¶ 256. For the foregoing reasons I concur.
¶ 257. I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK joins this concurrence.

 Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

 All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

 Dr. Wener also opined that Dr. Balink fell below the standard of care by applying excessive traction when resolving the shoulder dystocia, but this part of Dr. Wener's opinion is unchallenged.

 In total, the circuit court considered the admissibility of Dr. Wener's testimony three times: first at the pretrial hearing, second at trial pursuant to an objection to Dr. Wener's testimony, and third at the hearing on Dr. Balink's motion for a new trial.

 Dr. Balink complains of inconsistencies in Dr. Wener's testimony. As one example, Dr. Balink points to Dr. Wener's testimony that he would not use a vacuum for a baby with an estimated fetal weight greater than 4,500 grams by ultrasound and that babies with an estimated fetal weight of greater than 4,500 grams are associated with an increased risk of shoulder dystocia. Dr. Balink argues that Dr. Wener's testimony is inconsistent for the facts of this case because Braylon's actual birth weight was only 4,370 grams.

 All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.